IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES BUECHLER and GRETA EDWARDS, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>GANNETT COMPANY, INC.<br><br>Defendant. | Civil Action No. _______________<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs James Buechler and Greta Edwards ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Defendant Gannett Company, Inc. ("Gannett" or "Defendant"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. This is a class action brought on behalf of all persons who subscribed to a news website owned and operated by Defendant.[1]

2. Gannett, a mass media holding company, is the largest U.S. newspaper publisher as measured by total daily circulation. In addition to its newspapers, Gannett's portfolio includes the Gannett Sites which provide users with access to online articles and video content.

---

[1] The Gannett news websites at issue are listed in Exhibit A and are collectively referred to herein as the "Gannett Sites." The individual news outlets are defined as "News Outlets".

3.     On the Gannett Sites, Defendant offers the option for users to subscribe to newsletters, or subscribe to paid and unpaid accounts, all of which provide access to articles and video content, and, in exchange, require subscribers to provide personal information, including names and mailing addresses.

4.     Defendant does not adequately disclose on the Gannett Sites, however, that subscribers' personal identifying information are captured by tracking methods utilized by Defendant (referred to as the "Tracking Methods," discussed and defined herein), and then transferred to Facebook.

5.     Data sharing policies for a service or subscription is an important factor for individuals deciding whether to provide personal information to that service.

6.     Congress has recognized the potential harm caused by associating a person's personally identifiable information in conjunction with their video watching.

7.     Congress, therefore, passed the Video Privacy Protection Act ("VPPA"), prohibiting video tape service providers,[2] such as Defendant, from sharing personally identifiable information ("PII") tied to the title, description, or subject matter of prerecorded audio video material[3] (the "Video Watching Data") without valid consent.[4]

8.     Defendant has implemented and utilized the Tracking Methods which track user activity on the Gannett Sites and disclose that information to Facebook. In other words, the Defendant causes users' PII and Video Watching Data to be shared with Facebook, in violation of the VPPA.

---

[2] 18 USC 2710(a)(4).
[3] 18 USC 2710(b)(2)(D)(II).
[4] 18 USC 2710.

9. Defendant does not seek and has not obtained consent from users or subscribers to utilize the Tracking Methods to track, share, and exchange their PII and Video Watching Data with Facebook.

10. Defendant knew that its Tracking Methods resulted in VPPA violations, and that it failed to obtain users' consent to allow their Tracking Methods to operate in a way that shares users' information with Facebook.

11. Subscribers of the Gannett Sites have been harmed as a result of Defendant's violations of the VPPA. In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendant to immediately (i) remove the Tracking Methods from the Gannett Sites or (ii) add, and obtain, the appropriate consent from subscribers.

12. Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiffs seek relief in this action individually and on behalf of subscribers of the Gannett Sites for violations of the VPPA, 18 U.S.C. 2710.

## PARTIES

13. Plaintiff James Buechler is a resident of Maryland. On or about July 13, 2022, Mr. Buechler subscribed to Gannett's and the Tennessean's newsletter. During the sign-up process, Mr. Buechler was never asked for consent to share his information as a result of Defendant's Tracking Methods. Mr. Buechler subsequently watched prerecorded video content on the Tennessean website using a device that was signed into Facebook, as recently as mid-August, 2022, resulting in Mr. Buechler's PII and Video Watching Data being shared with Facebook. Mr. Buechler's Facebook profile included personally identifiable information. On August 23, 2022, Mr. Buechler served Gannett, as well as The Tennessean, with pre-suit notice

of the VPPA violations alleged herein. On September 7, 2022, Gannett responded to Mr. Buechler's letter.

14.     Plaintiff Greta Edwards is a resident of South Carolina.  In or around 2016 or 2017, 2022, Ms. Edwards subscribed to Gannett's and the Tennessean's newsletter.  During the sign-up process, Ms. Edwards was never asked for consent to share her information as a result of Defendant's Tracking Methods.  Ms. Edwards subsequently watched prerecorded video content on the Tennessean Website using a device that was signed into Facebook, resulting in Ms. Edwards's PII and Video Watching Data being shared with Facebook.  Ms. Edwards's Facebook profile included personally identifiable information.

15.     Defendant Gannett, Co., Inc. is incorporated in Delaware and maintains its headquarters in McLean, Virginia.  Defendant owns more than 260 daily publications and is the largest newspaper publisher in the United States.  Gannett owns each of the News Outlets and associated Gannett Sites. Gannett, along with each Gannett Site, offers guests of the Gannett Sites the option to sign-up for a newsletter or otherwise create an account or purchase a subscription. The Gannett Sites offer a selection of viewable media, including pre-recorded videos.

16.     Non-party The Tennessean is headquartered in Nashville, Tennessee, and provides daily news across multiple counties within Tennessee and Kentucky.  As a part of providing news media, The Tennessean has a Gannett Site (www.tennessean.com) which, in addition to offering visitors the option to subscribe to a newsletter, offers streaming prerecorded audio-visual media, articles, and links to other Gannett Sites.  The content and coding for the Gannett Sites stem from Gannett and, in fact, the pre-recorded video content on The Tennessean website – which is the subject of the VPPA violations at issue in this litigation – is streamed and hosted by Gannett.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

18. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from Defendant.

19. This Court has personal jurisdiction over Defendant because Defendant is incorporated in the state of Delaware.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is incorporated in the state of Delaware.

## COMMON FACTUAL ALLEGATIONS

### A. Background of the Video Privacy Protection Act

21. The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

22. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any

person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). The VPPA was initially passed in 1988 for the purpose of protecting the privacy of individuals' video rental, purchase and viewing data.

23.     In 1988, Senators were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

24.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

25.     During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[5]

---

[5] See *The Video Privacy Protection Act: Protecting Viewer Privacy In The 21st Century*, *Hearing Before the Subcomm. On Privacy, Technology and the Law of the Comm. On The Judiciary, United States Senate*, *112th Cong.*, *January 31, 2012,* COMMITTEE ON THE JUDICIARY,

26. Defendant here is a video service provider in that it provides pre-recorded audio-visual materials to Plaintiffs and Class members on the Gannett Sites.

27. The relationship between Plaintiffs and Defendant is precisely the type of relationship contemplated by the VPPA.

28. In this case, Defendant knowingly and systematically disclosed Plaintiffs' personal viewing information to Facebook, without obtaining their consent.

**B. Gannett Utilizes Facebook Tracking Methods to Gather and Transmit PII and Video Watching Data**

29. Facebook provides tools for web developers to utilize to monitor user interactions on their websites, which can then be shared with Facebook (e.g*.,* the Tracking Methods).

30. The primary purpose of the Tracking Methods, regardless of which, is the same: to gather, collect and then share user information with Facebook. Examples of Tracking Methods include event monitoring tools provided by the Facebook Pixel, which are available to web developers for the purposes sharing user activity with third parties.

31. Web developers can use the Tracking Methods to share both user activity and user identity with Facebook.

32. When a Facebook user logs into Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[6]

33. A Facebook UID can be used, by anyone, to easily identify a Facebook user. Once the Tracking Methods' routine exchange of information is complete, the UID that becomes

https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited Sept. 02, 2022).

[6] *Cookies & other storage technologies*, FACEBOOK https://www.facebook.com/policy/cookies/ (last visited November 3, 2022).

available can be used by any individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

**a. The Facebook Pixel as a Tracking Method**

34. The Facebook Pixel (the "Pixel") tracks user-activity on web pages by monitoring events which,[7] when triggered, causes the Pixel to automatically send data directly to Facebook through "requests."[8]

35. Three examples of events utilized by websites, including the Gannett Sites, include a user loading a page with (i) "microdata" tags (the "Microdata event"),[9] or (ii) with a Pixel installed (the "PageView event"), or (iii) loading a specific page being tracked by a Pixel (the "ViewContent event").[10]

36. The presence of Pixel events, such as Microdata, ViewContent, and PageView, can be confirmed by using the Facebook Pixel Helper tool.

37. When a Pixel event is triggered, a "request" is sent to Facebook (through URL www.facebook.com/tr/).[11]

---

[7] *Meta Business Help Center: About Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited November 3, 2022).

[8] *See generally Id.*

[9] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited November 3, 2022).

[10] *Meta Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited November 3, 2022).

[11] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited November 3, 2022).

38.     Where a c_user cookie is active on a user's device, the website's Tracking Methods will forward the user's UID to Facebook through a "request."[12]

39.     The inclusion of a user's UID in the "Request Header" is depicted, for example, in this image derived from a developer's console monitoring the verification "request" made by Gannett's azcentral.com (the "Arizona Republic") website:[13]



40.     This method of attaching a user's Facebook UID to Pixel requests is common across all the Tracking Methods implemented by the Gannett Sites, as seen in Exhibits B (PageView), C (ViewContent), and D (MicroData).

41.     In addition to automatically issuing the "request" with a Facebook user's UID, website developers' "requests" to Facebook contain additional parameters embedded in the "request" URLs, which include the addresses of the web pages issuing the "requests" and the titles of video content viewed by the users.

---

[12] *HTTP cookies explained*, HUMAN WHO CODES https://humanwhocodes.com/blog/2009/05/05/http-cookies-explained/ (last visited November 3, 2022).
[13] THE ARIZONA REPUBLIC, https://www.azcentral.com/videos/news/local/arizona-investigations/2022/11/01/video-constable-doug-clark-serves-eviction-notice-marcus-mungeam/10651656002/ (last visited November 2, 2022).

42. A URL, in addition to a domain name and path, will often contain parameters. Parameters are values added to a URL to transmit data and direct a web server to provide additional services, as depicted below:

*Figure 1 - Mozilla's diagram of a URL, including parameters*[14]

43. The inclusion of the web page address and video content information is depicted below on Gannett's Arizona Republic website:[15]

44. The information sharing depicted above was derived from a developer's console monitoring Gannett's Arizona Republic website and reflects what occurred as part of a "request" by Gannett to Facebook.

45. The PageView and ViewContent events, when used in the manner alleged here, collects and transmits both video data and user information through these URL "requests."

46. The Tracking Methods, when triggered, independently and automatically result in sharing a user's website interactions and Facebook UID with Facebook.

---

[14] What is a URL?, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited November 3, 2022).
[15] THE ARIZONA REPUBLIC, https://www.azcentral.com/videos/news/local/arizona-investigations/2022/11/01/video-constable-doug-clark-serves-eviction-notice-marcus-mungeam/10651656002/ (last visited November 2, 2022).

47. Requests sent by the Pixel, for events such as PageView and ViewContent, include parameters in the request which provide websites and Facebook with additional information about the event being triggered.[16]

48. The parameters for a request, for instance, may include the title of a video being watched or the URL of the video, as depicted below:

*Figure 2 - PageView event firing, including video title and URL of video as parameters of URL request*[17]

49. The Gannett Sites similarly send video titles and URLs of the videos through their PageView and ViewContent requests, as depicted in Exhibits B and C.

50. Microdata events are triggered whenever a web page containing Microdata tags is loaded.[18]

[16] *Meta for Developers: Conversion Tracking*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited November 3, 2022).

[17] THE ARIZONA REPUBLIC, https://www.azcentral.com/videos/news/local/arizona-investigations/2022/11/01/video-constable-doug-clark-serves-eviction-notice-marcus-mungeam/10651656002/ (last visited November 2, 2022).

[18] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited November 3, 2022).

51. Microdata tags allow developers to nest metadata within the contents of a web page.[19]

52. This metadata may include the title of a video – for example, here, "og:title": "Video: Constable Doug Clark serves eviction notice to Marcus Mungeam" – on the Arizona Republic website, as depicted below:

*Figure 3 - Microdata Event sends Microdata tag for video's title to Facebook.*[20]

53. When a Microdata event fires, it sends a request to Facebook containing data, including, but not limited to, the Microdata tags, as depicted in the Facebook Pixel Helper tool above and the developer's console "Payload" tab below:

*Figure 4 - Microdata Payload Tab Confirms Sending Microdata tags*[21]

---

[19] *Meta for Developers: Microdata Tags*, FACEBOOK https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited November 3, 2022).

[20] THE ARIZONA REPUBLIC, https://www.azcentral.com/videos/news/local/arizona-investigations/2022/11/01/video-constable-doug-clark-serves-eviction-notice-marcus-mungeam/10651656002/ (last visited November 2, 2022).

[21] *Id.*

54. As a result of Gannett's implementation of the Tracking Methods, the PII and Video Watching Data of subscriber-users, including Plaintiffs and Class Members, have automatically been shared with Facebook in a consistent manner across all Gannett Sites.

**C. <u>Defendant's Build, Content-Creation, and General Uniformity of the Gannett Sites</u>**

55. Gannett was founded in 1906, when Frank Ernest Gannett began buying small newspapers in New York, and expanded over the years to include over 200 news media companies across 46 states.[22]

56. Gannett's News Outlets have distributed pre-recorded audio-visual material, through the use of websites, to persons and entities throughout the United States. This includes the Gannett Sites at issue.

57. Gannett operates as a "subscriber-led and digitally focused media and marketing solutions company" with a portfolio of "local media outlets[.]"[23]

58. Gannett specifically notes it has "created a powerful network of brands and capabilities" to preserve local journalism and "connect people to content that matters . . . ."[24]

59. Gannett works with the News Outlets to operate the Gannett Sites. What's more, the operability of the Gannett Sites is reliant on Gannett – e.g., the content available on the sites is managed and hosted by Gannett.

60. Each Gannett Site appears to be an individual site, completely separate from other Gannett Sites. In practice, however, they all share the same source of information, the same media host, the same visual and software design template, and the same owner and operator: Gannett.

---

[22] *About Us,* GANNETT, https://www.gannett.com/who-we-are/ (last visited November 3, 2022).
[23] *Id.*
[24] *Id.*

61. The Gannett Sites share the same design template. The Gannett Sites share the same source for content. The Gannett Sites also use the same access to pre-recorded videos and the Tracking Methods. The HTML headers across the Gannett Sites, for example, use the same visual and coding design.[25]

62. The header on the Arizona Republic website, for example, includes its brand logo and a navigational bar, set of navigational submenus, a search bar, weather display, subscribe button, and log-in button[26]:

63. This same visual design is applied in the headers on all Gannett Sites. Exhibit E to this Complaint illustrates the matching banner design and navigational menu consistent across the Gannett Sites.

64. The header used for each of the Gannett Sites is, at a coding level, referred to as "gnt_n."

65. The navigation bar used for each of the Gannett Sites is, at a coding level, referred to as "gnt_n_mn."

66. The logo for the News Outlet used for each of the Gannett Sites is, at a coding level, labeled as the "gnt_n_lg_w."

67. When viewed as HTML with an internet browser's developer's console (the "developer's console"), the headers codes – "gnt_n," "gnt_n_mn" and "gnt_n_lg_w" (or gnt logo

---

[25] For example, an HTML header represents a container for introductory content or a set of navigational links. *See* *<header>*, MOZILLA https://developer.mozilla.org/en-US/docs/Web/HTML/Element/header (last visited November 3, 2022).
[26] THE ARIZONA REPUBLIC, https://www.azcentral.com/ (last visited October 27, 2022).

code) – are consistent across all the Gannett Sites. By way of example, the Arizona Republic's coding schemes, using the developer's console to confirm the same three "gnt" header codes is depicted below:[27]

```
▼<header class="gnt_n" onmousedown="event.stopPropagation()" onmouseup="event.stopPropagation()"> container
  ▶<div class="gnt_n_lg_w">…</div>
  ▶<div class="gnt_n_sm gnt_n_sm__ne gnt_n_nc__hbn">…</div>
  ▶<div class="gnt_n_sm gnt_n_nc__hbn">…</div>
  ▶<nav class="gnt_n_mn" aria-label="Global navigation">…</nav> container flex
 </header>
```

Exhibit F to this Complaint illustrates the use of the same header codes across the Gannett Sites.

68. When viewed as HTML with a developer's console, the advertising codes – "gnt_m," "gnt_x," "gnt_x__lbl," and "gnt_x__hi" – are consistent across all the Gannett Sites. By way of example, the Arizona Republic's coding schemes, using the developer's console to confirm the same four "gnt" advertising codes is depicted below:[28]

69. The primary content is then organized under the "gnt_cw" class. This is consistent across all the Gannett Sites.

70. The "gnt_cw" class contains subdivisions labeled "gnt_m_dl." The "gnt_m_dl" class breaks the site into sections, such as "Watch Now," "More Stores," "Local," etc. This can

[27] *Id.*
[28] *Id.*

be confirmed by viewing the HTML for any of the Gannett Sites.  A view of the Arizona Republic

through the developer's console is depicted below:[29]



Exhibit F to this Complaint illustrates the use of the same "gnt_cw" class across the Gannett Sites.

71.     The Gannett Sites use the same side bar scheme, labeled "gnt_rr."  The "gnt_rr"

scheme includes the "gnt_m_th" class to denote the Top Headlines region.  This can be confirmed

by viewing the HTML for any of the Gannett Sites.  A view of the Arizona Republic through the

developer's console is depicted below:[30]



---

[29] *Id.*

[30] *Id.*

Exhibit F to this Complaint illustrates the use of the same side bar scheme across the Gannett Sites.

72.     The Gannett Sites use the "gnt_ft" class to define the footer.   The "gnt_ft" class includes sub-elements consisting of the same "gnt" advertising codes, the same "gnt" logo code, and "gnt_ft_ls" defining a list of links in the footer.   The "gnt_ft_ls" list includes items such as "About," "Support," "Stay Connected," and "Our Partners." This can be confirmed by viewing the HTML for any of the Gannett Sites.  A view of the Arizona Republic through the developer's console is depicted below:[31]



73.     Exhibit F to this Complaint illustrates the use of the same "gnt" footer code across the Gannett Sites.

74.     The use of "gnt_n," "gnt_m," "gnt_cw," gnt_rr," and "gnt_ft," and their associated sub-elements and structure, to define and organize the layout of the Gannett Sites is identical among the Gannett Sites.

---

[31] *Id.*

75.    In sum, the website design for the Gannett Sites can be broken into the following design scheme and elements (the "Design Scheme"):





76.     The Gannett Sites follow the Design Scheme.

77.      The Gannett Sites do not use unique coding terms for critical elements on each of the respective sites.

78.     The Gannett Sites utilize the same media hosting service.  All of the "gnt" and associated coding discussed throughout paragraphs 64 through 74 are all named for "Gannett." There is no independent coding for each of the News Outlets.  Instead, all are identified as and derived from Gannett.

79.     The consistencies among the Gannett Sites also include the use of Gannett-supplied and Gannett-hosted media, through the use of www.gannett-cdn.com, or Gannett's content delivery network ("CDN").  This can be confirmed by viewing the HTML for any of the Gannett Sites.

80. By way of example, a view of the Arizona Republic through the developer's console is depicted below:[32]

```
▼<head>
   <meta charset="utf-8">
   <meta name="viewport" content="width=device-width,initial-scale=1,minimum-scale=1">
   <meta name="theme-color" content="#0098FE">
   <title>azcentral.com and The Arizona Republic: Phoenix and Arizona news</title>
   <meta property="og:title" content="azcentral.com and The Arizona Republic: Phoenix and Arizona news">
   <link rel="dns-prefetch" href="//user.azcentral.com">
   <link rel="preconnect" href="https://user.azcentral.com">
   <link rel="dns-prefetch" href="//www.gannett-cdn.com">
   <link rel="dns-prefetch" href="//securepubads.g.doubleclick.net">
```

81. Gannett's CDN operates as a central media storage which the Gannett Sites use to request images and media content to be viewed on the website. The News Outlets do not hosting that content locally. This can be confirmed by viewing the HTML for any of the Gannett Sites.

82. By way of example, a view of the Arizona Republic through the developer's console is depicted below:[33]

83. The content or assets viewable on the Gannett Sites (*e.g.,* images, videos, logos, animated banners) are hosted and stored on Gannett servers.

84. The Arizona Republic retrieves video content from Gannett servers downloadmedia.gannett-cdn.com. The Arizona Republic does not host the video locally. This

[32] *Id.*
[33] *Id.*

can be confirmed by observing the "data-c-vpdata=" element with the developer's console, as depicted below:[34]

85. The use of "downloadmedia.gannett-cdn.com" and of pre-recorded audio-visual material is the same across the Gannett Sites.

86. The Gannett Sites rely on Gannett servers to provide media, including pre-recorded content, to its website visitors including subscribers. The reliance on Gannett extends to photos and videos that are attributable to the News Outlets themselves.

87. The Arizona Republic, in one instance, used photos for an article about a local woman. The photo of the local woman was hosted by Gannett servers (www.gannett-cdn.com "CDN")). This was confirmed using the developer's console, as depicted below: [35]

[34] *Id.*
[35] *Id.*



88. In practice, when a Gannett Site is visited by a user, it requests the assets or content from Gannett, which are subsequently loaded to the user's computers.

89. The Gannett Sites cannot deliver or load assets, including videos or images, to users without Gannett's consistent management, content development, and hosting as applied to the Gannett Sites.

**D. <u>Defendant Shared Plaintiffs' PII and Video Watching Data in Violation of the VPPA</u>**

90. Defendant violates the VPPA through its use of the Tracking Methods – specifically, tracking by and through Facebook – on its Gannett Sites.

91. The Tracking Methods allow Defendant to share a user's website usage data with Facebook, in conjunction with the user's Facebook UID, which allows for Facebook to develop better targeted advertising, among other business functions.

92. The Gannett Sites implement the Tracking Methods which track video watching history by identifying the name and location (via URL) of specific video content watched by Plaintiffs and Class Members, as well as the Plaintiffs' and Class Members' Facebook UID through their c_user cookies.

93. Below is a sample detailing how Defendant violates the VPPA on the Tennessean website, through its use of the Tracking Methods. Defendant also violates the VPPA on the remaining Gannett Sites using the Tracking Methods. Information pertaining to Defendant's like violations of the VPPA as applied to a sampling of Gannett Sites is included in Exhibits B, C, and D, attached hereto.

**a. The Tennessean, By Way of Example, Tracks Plaintiffs' Video Watching History and PII on the Tennessean Website and Transmits the Data to Facebook**

94. Akin to each of the Gannett Sites, the Tennessean Website implements the Tracking Methods.

95. The Tennessean, during the relevant period, utilized various Pixel tracking tools.

96. The Tennessean's use of the Tracking Methods were, and are, in violation of the VPPA.

97. The Tennessean's use of the Pixel is depicted by:

*Figure 5 Pixel events are active and confirmed by Facebook Pixel Helper*[36]

[36] THE TENNESSEAN, https://www.tennessean.com/story/opinion/columnists/david-plazas/2020/04/10/tennessee-voices-videocast-david-plazas/2955130001/ (last visited November 3, 2022)

98.     The Tennessean website uses the Tracking Methods to capture Plaintiffs' and Class Members' Facebook UID in the form of the c_user cookie, as described above in paragraphs 38-39.

99.     Gannett uses the Tracking Methods to share the video watching data in two ways: (i) through the "request" URL parameters described above in paragraphs 41-43 and 47-48; and (ii) through the MicroData tags shown to be active in paragraphs 35 and 50-53, and Figures 3 and 4, which track, among other data, the title of the video.

100.    The Tracking Methods' use of "request" URL parameters to share the video title and URL of the location of the video is confirmed by using the developer's console to monitor the requests made by the Tennessean website to Facebook, as depicted above in paragraph 97, Figure 5.

101.    Other Pixel "requests" will send the Video Watching Data through Microdata tags embedded in the requests' "payload."

102.    The same Tracking Methods, utilizing the same "request" process, was implemented by Gannett for the Gannett Sites.  A sampling of the Gannett Sites' identical use of the request process is reflected in Exhibits B, C, and D, attached.

103.    The Pixel uses these "requests" to pass the Video Watching Data to Facebook.

104.    Gannett's sharing of Class Members' Facebook UID occurs in a consistent manner across the Tracking Methods, resulting when an active c_user cookie exists on user's device used to load the Tennessean website, allowing Gannett to include user's Facebook UID in its request header to Facebook.  This process is confirmed by using the developer's console to monitor the Tennessean website requests to Facebook, as depicted above in paragraph 97, Figure 5.

105. The Tracking Methods, as implemented by Gannett and the Tennessean, send the collected PII and Video Watching Data automatically to Facebook when triggered.

106. When the Microdata event triggers on the Tennessean website, the PII and Video Watching Data are sent to Facebook through a request made to www.facebook.com/tr/.

107. When the "PageView" event triggers on the Tennessean website, the video title and PII are sent to Facebook through a request made to www.facebook.com/tr/, as verified in Paragraph 48 and Figure 2.

108. When the Tracking Methods trigger, Gannett and The Tennessean automatically transmit the Facebook UID and title of the video to Facebook.

109. The practice of having the PII and video titles sent to Facebook through an automatic request delivered to www.facebook.com/tr/ is consistent among the Gannett Sites.

## E. The Sign-Up Process Associated With the Gannett Sites Lacks Informed, Written Consent

110. The Gannett Sites do not seek nor obtain permission from their subscribers, including Plaintiffs and the Class, to share the subscribers' PII or video watching information with third parties, including Facebook.

111. The sign-up process associated with the Gannett Sites does not include a process for seeking or obtaining informed, written consent.

112. To the extent information about any of the Gannett Sites' data sharing can be located, the language is not presented to subscribers or users along with a checkbox, e-signature field, or any form of affirmative consent.

113. By way of example, the sign-up form for Tennessean newsletters appears as:

*Figure 6 Sign-up form for The Tennessean Newsletter*[37]

114. A sampling of newsletter sign-up forms on the Gannett Sites is included in Exhibit G, attached hereto.

**F. Plaintiffs Did Not Consent to Defendant's sharing of Plaintiffs' PII and Video Watching Data**

115. The VPPA sets out narrow guidelines as to the acceptable forms of consent that consumers can give to video tape service providers to share consumers' information.

116. The VPPA limits video tape service providers' ability to share consumers' PII with third-parties, except where consumers provide "informed, written consent (including through an

[37] THE TENNESSEAN, https://profile.tennessean.com/newsletters/manage/ (last visited November 3, 2022).

electronic means using the Internet) . . . in a form that is distinct and separate from any form setting forth other legal or financial obligations of the consumers."[38]

117. Such consent must be at the election of consumers, and consumers must be clearly and conspicuously provided with an opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.[39]

118. While limited information regarding consumers can be shared (e.g., name and address) to third parties, this exemption only applies where video tape service providers give the consumer a clear and conspicuous opportunity to prohibit this disclosure and the disclosure does not identify the title, description, or subject matter of the audio-visual material.[40]

119. Plaintiffs and Class Members did not consent to Defendant's Tracking Methods pursuant to the VPPA, as Plaintiffs were not asked to provide informed, written consent in a form a separate from other legal obligations.

120. Additionally, Plaintiffs and Class Members are not given the opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.

121. Finally, Defendant provides titles, descriptions, or subject matter of audio-visual materials when sharing Plaintiffs' and Class Members' PII.

## CLASS ACTION ALLEGATIONS

122. Plaintiffs bring this action individually and on behalf of the following Class:

> All persons in the United States with a subscription to a Gannett Site that had their personal information improperly disclosed to Facebook through the use of the Tracking Methods (the "Class").

[38] 18 USC 2710(b)(2)(B); 18 USC 2710(b)(2)(B)(i).
[39] 18 USC 2710(b)(2)(B)(ii); 18 USC 2710(b)(2)(B)(iii).
[40] 18 USC 2710(b)(2)(D)

123.     Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

124.     Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

125.     This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

126.     Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of and number of Gannett Sites, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

127.     Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, subscribed to, and used, a Gannett Site to watch videos, and had their PII collected and disclosed by Defendant.

128.     Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class.   Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

129. Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class members is relatively small, the expense and burden of individual litigation make it impossible for individual Class members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

130. Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

a. Whether Defendant collected Plaintiffs' and the Class's PII and Video Watching Data;

b. Whether Defendant unlawfully disclosed and continues to disclose the PII and Video Watching Data of subscribers of the Gannett Sites in violation of the VPPA;

c. Whether Defendant's disclosures were committed knowingly; and

d. Whether Defendant disclosed Plaintiffs' and the Class's PII and Video Watching Data without consent.

131. Information concerning Defendant's Gannett Sites data sharing practices and subscription members are available from Defendant's or third-party records.

132. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

133. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

134. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

135. Given that Defendant's conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

136. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

137. Plaintiffs bring this count on behalf of themselves and all members of the Class.

138. The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

139. Defendant violated this statute by knowingly disclosing Plaintiffs' and other Class members' personally identifiable information to Facebook.

140. Defendant, through the Gannett Sites, engage in the business of delivering video content to subscribers, including Plaintiffs and the other Class members, and other users. The Gannett Sites deliver videos to subscribers, including Plaintiffs and the other Class members, by

making those materials electronically available to Plaintiffs and the other Class members on the Gannett Sites.

141.    "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

142.    A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." 18 U.S.C. § 2710(a)(4).

143.    Defendant is a "video tape service providers" because it creates, hosts, and delivers hundreds of videos on its websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

144.    Defendant also solicits individuals to subscribe to the Gannett Sites.

145.    Plaintiffs and members of the Class are "consumers" because they subscribed to the Gannett Sites. 18 U.S.C. § 2710(a)(1).

146.    Plaintiffs and the Class members viewed video clips using the Gannett Sites.

147.    Defendant disclosed to Facebook Plaintiffs' and the Class members' personally identifiable information. Defendant utilized the Tracking Methods to force Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' event data, like the title of the videos they viewed.

148.    Defendant knowingly disclosed Plaintiffs' PII, which is triggered automatically through Defendant's use of the Tracking Methods.   No additional steps on the part of the Defendant, Facebook or any third-party is required.   And, once the Tracking Methods' routine

exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

149.   The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

150.   Plaintiffs and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.  Defendant (and the News Outlets themselves) failed to obtain "informed, written consent" from subscribers – including Plaintiffs and Class members – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

151.   Defendant's disclosure of Plaintiffs' and Class Members' Video Watching Data and PII was not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

152.   In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the

consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

153.    On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b)    For an order declaring the Defendant's conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to requiring Defendant to immediately (i) remove the Tracking Methods from the Gannett Sites or (ii) add, and obtain, the appropriate consent from subscribers;

(e)    For damages in amounts to be determined by the Court and/or jury;

(f)    An award of statutory damages or penalties to the extent available;

(g)    For Defendant to pay $2,500.00 to Plaintiffs and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h) For pre-judgment interest on all amounts awarded;

(i) For an order of restitution and all other forms of monetary relief;

(j) An award of all reasonable attorneys' fees and costs and

(k) Such other and further relief as the Court deems necessary and appropriate.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: November 7, 2022

**deLeeuw Law LLC**

*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw (DE Bar # 3569)
1301 Walnut Green Road
Wilmington, DE 19807
(302) 274-2180
(302) 351-6905 (fax)
brad@deleeuwlaw.com

OF COUNSEL:

**LEVI & KORSINSKY, LLP**

Mark S. Reich
Courtney E. Maccarone
Gary S. Ishimoto
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Emails:mreich@zlk.com
cmaccarone@zlk.com
gishimoto@zlk.com

*Counsel for Plaintiffs*