# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAMES BUECHLER and GRETA EDWARDS, ON Behalf of Themselves and All Other Similarly Situated, | ) ) ) | C.A. No. 22-1464-CFC |
| | ) | |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| v. | ) | |
| | ) | |
| GANNETT COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OPENING BRIEF
## IN SUPPORT OF ITS MOTION TO DISMISS

OF COUNSEL:

David L. Yohai
Blake J. Steinberg
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
david.yohai@weil.com
blake.steinberg@weil.com

David R. Singh
Amy T. Le
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
david.singh@weil.com
amy.le@weil.com

Dated:  January 17, 2023

Kelly E. Farnan (#4395)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Counsel for Defendant Gannett Co., Inc.*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT .............................................................................1

BACKGROUND ....................................................................................................3

LEGAL STANDARD FOR MOTION TO DISMISS................................................7

ARGUMENT .........................................................................................................8

I.    Plaintiffs Consented to a Class Waiver, Barring Their Putative Class
      Claims. ........................................................................................................8

II.   Plaintiffs Fail to State Individual Claims Under the VPPA. .........................10

      A.    Gannett Is Not A Video Tape Service Provider..................................10

      B.    The Newsletter Falls Outside the VPPA's Ambit...............................11

      C.    Plaintiffs Have Not Plausibly Alleged Gannett Disclosed PII............13

      D.    Plaintiffs Have Not Plausibly Alleged Gannett "Knowingly"
            Disclosed PII. ...................................................................................15

      E.    Gannett Met the VPPA's Requirements in Obtaining Plaintiffs'
            Consent to the Alleged Disclosures. ..................................................16

III.  Plaintiffs Lack Article III Standing. ............................................................18

      A.    Plaintiff Has Not Suffered an Injury in Fact. .....................................18

      B.    Plaintiff's Injury Is Not Fairly Traceable to Gannett's Conduct. .......20

CONCLUSION ....................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)............................................................9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................7

*Atramian v. Gorkin*,
  No. 97C-08-001, 1999 WL 743663 (Del. Super. Aug. 13, 1999),
  *aff'd*, 746 A.2d 275 (Del. 2000) (unpublished table decision, text
  available at 2000 WL 139979) ............................................18

*Austin-Spearman v. AMC Network Ent. LLC*,
  98 F. Supp. 3d 662 (S.D.N.Y. 2015) ..........................................12, 20

*Ballentine v. United States*,
  486 F.3d 806 (3d Cir. 2007) ...................................................7

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
  Case No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230
  (S.D.N.Y. Aug. 11, 2017) .....................................................15

*Buck v. Hampton Twp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006) .................................................3

*Campeau v. SSA*,
  575 F. App'x 35 (3d Cir. 2014) ..............................................20, 21

*Chesapeake Utilities Corp. v. Am. Home Assur. Co.*,
  704 F. Supp. 551 (D. Del. 1989).............................................12

*E. States Constr. Serv., Inc. v. City of Dover*,
  No. 12C-05-041 JTV, 2014 WL 807916 (Del. Super. Feb. 26,
  2014) .........................................................................9

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) ...............................................14

*Horowitz v. AT&T Inc.*,
  No. 3:17-CV-4827-BRM-LHG, 2018 WL 1942525 (D.N.J. Apr.
  25, 2018), *opinion clarified on denial of reconsideration*, 2019 WL
  77306 (D.N.J. Jan. 2, 2019) ................................................................9

*Hughes v. United Parcel Serv., Inc.*,
  639 F. App'x 99 (3d Cir. 2016) ....................................................6, 11

*In re Hulu Priv. Litig.*,
  86 F. Supp. 3d 1090 (N.D. Cal. 2015)..............................................15

*In re Hulu Priv. Litig.*,
  No. C 11-03764 LB, 2014 WL 2758598 (N.D. Cal. June 17, 2014) ................20

*Korea Wk., Inc. v. Got Cap., LLC*,
  No. CV 15-6351, 2016 WL 3049490 (E.D. Pa. May 27, 2016)..........................9

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004)................................................................................11

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................20

*Micro Focus (US), Inc. v. Ins. Servs. Off., Inc.*,
  No. CV 15-252-RGA, 2021 WL 4061141 (D. Del. Sept. 7, 2021) ....................8

*Miracle-Pond v. Shutterfly, Inc.*,
  No. 19 CV 04722, 2020 WL 2513099 (N.D. Ill. May 15, 2020) ........................9

*In re Nickelodeon Consumer Priv. Litig.*,
  827 F.3d 262 (3d Cir. 2016) .........................................................*passim*

*Rabinowitz v. Alltran Fin. LP*,
  No. 21-12756, 2022 WL 16362460 (D.N.J. Oct. 25, 2022) ..............................19

*Robinson v. Disney Online*,
  152 F. Supp. 3d 176 (S.D.N.Y. 2015) ........................................15, 16

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016).........................................................................8, 20

*St. Louis Heart Center, Inc. v. Nomax, Inc.*,
  899 F.3d 500 (8th Cir. 2018) ...........................................................21

*Tomasi v. Township of Long Beach*,
796 F. App'x 766 (3d Cir. 2020) ........................................................................21

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021).........................................................................8, 18, 19

*United States v. Shultz*,
No. 16-10107-01-EFM, 2018 WL 534333 (D. Kan. Jan. 24, 2018) .................12

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) ............................................................11

*Wilson v. Triller*,
598 F. Supp. 3d 82 (S.D.N.Y. 2022) ................................................................14

**Statutes**

Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.*.................................*passim*

**Other Authorities**

S. Rep. No. 100-599 (1988) ......................................................................................1

134 Cong. Rec. S5397-01 .......................................................................................10

United States of America's Memorandum in Support of the
Constitutionality of the Video Privacy Protection Act, *Stark et al.
v. Patreon, Inc.*,
No. 3:22-cv-03131-JCS (N.D. Cal. Dec. 5, 2022), D.I. 49-1 ...........................11

Facebook, *Cookies Policy*,
https://www.facebook.com/privacy/policies/cookies.............................4, 14, 21

*The Tennessean*, https://www.tennessean.com/................................................*passim*

Defendant Gannett Co. Inc., incorrectly sued as Gannett Company, Inc. ("Defendant" or "Gannett") respectfully submits this opening brief in support of its motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

This lawsuit is a misguided attempt to expand the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.* (the "VPPA"), a statute intended to apply to video tape service providers engaged in the business of delivering prerecorded video cassette or similar audio visual materials to renters, purchasers, or subscribers of such services, to a local news provider. "Congress's purpose in passing the [VPPA] was quite narrow," *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016), enacting the VPPA in response to a single event: Following the nomination of Judge Robert Bork to the Supreme Court, a movie rental store disclosed his movie rental history to a Washington newspaper, which then published a profile about Judge Bork based on "the titles of 146 films his family had rented." S. REP. NO. 100-599, at 5-6 (1988). The Third Circuit has admonished that it does "not think that, when Congress passed the Act, it intended for the law to cover factual circumstances far removed from those that motivated its passage." *Nickelodeon*, 827 F.3d at 284. Yet in an attempt to cash in on the statutory damages available under the VPPA, Plaintiffs assert the tortured theory that by signing up for a

newsletter from one of Gannett's local daily publications (the "Newsletter") they have subscribed to "goods or services from a video tape service provider," making them "consumers" under the VPPA.  18 U.S.C. § 2710(a)(1); Compl. ¶¶ 13, 14.

Plaintiffs' Complaint should be dismissed for at least three reasons.  First, without need to even consider whether Plaintiffs have stated a VPPA claim, their putative class claims fail as a matter of law because, as is clear from the judicially noticeable website terms, they each agreed to a class waiver.  Second, Plaintiffs have not alleged facts stating a VPPA claim because they do not plausibly allege that (a) Gannett is a video tape service provider, (b) the Newsletter constitutes a good or service within the VPPA's ambit, (c) Gannett disclosed their PII, or (d) Gannett disclosed their PII knowingly; and, in any event, Plaintiffs' VPPA claims also fail because Gannett obtained their consent to any disclosures.  Third, Plaintiffs' claims must also be dismissed because they suffered no injury and thus lack Article III standing:   They allege only an intangible harm not closely related to those traditionally recognized at common law.  Moreover, to the extent they suffered any injury at all, it was caused by the operation of Facebook's cookies and their own conduct (e.g., consenting to Facebook's placement of the cookies), and so is not fairly traceable to Gannett's conduct.

## BACKGROUND

***The Parties.***   Gannett is a media company focused on distribution of journalism and news, including via daily local newspapers such as *The Tennessean*. Compl. ¶ 2.  *The Tennessean* focuses on news coverage for the greater Nashville area, covering topics such as local politics, sports, and music.  *See, e.g.,* The Tennessean, *Home Page*, https://www.tennessean.com/news/ (last visited Jan. 14, 2023).[1]   Plaintiffs claim to subscribe to "Gannett's and the Tennessean's newsletter,"[2] and to have watched "prerecorded video content" on *The Tennessean*'s website while logged into their Facebook accounts.  Compl. ¶¶ 13, 14.

***The Alleged Disclosures.***   Plaintiffs allege that Gannett's publications' websites track and share visitors' personally identifiable and video watching information with Facebook via the Facebook Pixel, a common digital marketing tool.  Compl. ¶¶ 29-54, 94-109.  According to Plaintiffs, the information identifying visitors is transmitted via a "c_user" cookie that is "automatically created and stored

---

[1] The Court may consider the content of *The Tennessean* website because Plaintiffs' claims are predicated on their alleged use of the website and the Complaint incorporates the website by reference.  *E.g.*, Compl. ¶ 16; *see Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

[2] While Gannett's publications offer newsletters, there is no separate "Gannett newsletter" as suggested by Plaintiffs' allegations.  The Court may consider the sample Newsletter attached to Gannett's Motion because the Newsletter is referenced in the allegations and is "integral" to the claims.  *Buck*, 452 F.3d at 260; Exhibit A to Gannett's Motion to Dismiss.

on the user's device" when that "user logs into Facebook." This cookie allegedly "contains a user's non-encrypted Facebook User ID number ('UID')." Compl. ¶ 32.

Information incorporated by reference into Plaintiffs' Complaint establishes that this cookie is Facebook's and that Facebook uses the cookie to "keep [users] logged in" and to "remember [users'] browser[s] so [they] don't have to keep logging in to Facebook." *See id.* n.6 (citing Facebook, *Cookies Policy*, https://www.facebook.com/privacy/policies/cookies (Oct. 5, 2022) (click "Authentication")). This cookie is only deposited on Plaintiffs' browsers because Plaintiffs chose not to opt out of cookie placement. *Id.* (click "Browser cookie controls") (explaining that users can adjust their browser settings to "choose whether browser cookies are set and to delete them"). Given the cookie is Facebook's, not Gannett's, Gannett cannot have "transmit[ted] the Facebook UID" to Facebook, let alone done so knowingly. Compl. ¶¶ 10, 28, 108, 139.

In addition, while Plaintiffs explain how Facebook UIDs correspond with Facebook profiles (Compl. ¶ 33), they never explain how (if at all) ordinary persons could decipher the *c_user cookie* to identify a person. Indeed, the images provided in the Complaint purportedly showing Facebook UIDs are taken from the "developer's console" on a specific person's browser. *Id.* ¶ 44. These images therefore do not address whether a different person would be able to use someone else's c_user cookie to identify that person.

***The Website Terms.***   As Plaintiffs' Complaint shows (Compl. ¶ 113), individuals who sign up for the Newsletter affirmatively consent to *The Tennessean*'s Privacy Policy, Cookie Policy, and Terms of Service.  Immediately below a button that says "Sign Up," the website states:  "Signing up for newsletters indicates you agree with our . . . Terms of Service · Privacy Policy . . . [and] Cookie Policy."  The hyperlinked phrases "Terms of Service," "Privacy Policy," and "Cookie Policy" are underlined and bolded, and clicking on the hyperlinks leads individuals to the corresponding Terms and Policies, which they can easily scroll through and read.  To finish signing up for the Newsletter, individuals must click the "Sign Up" button, confirming their agreement to the website terms.  *See also* The Tennessean, *Newsletter Sign-Up Page*, https://profile.tennessean.com/newsletters/manage/ (last visited Jan. 14, 2023).

The Privacy Policy contains a binding class waiver, which provides:  "You and Gannett agree that each party may bring disputes against the other party only in an individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding, including, without limitation, a federal or state class action lawsuit."  The Tennessean, *Privacy Policy* (July 25, 2022), https://cm.tennessean.com/privacy#otnotice-section-9a87c479-830e-4fd7-889d-4402100fad01.  Prior to July 25, 2022, the Privacy Policy did not contain a class waiver, but provided for a unilateral right to amend:  "We may amend this Privacy

5

Policy at our discretion and at any time . . . your continued use of our Website and/or Services following the posting of changes constitutes your acceptance of such changes."  *See* Exhibit B to Gannett's Motion to Dismiss at 10.[3]  The Terms of Service similarly reserved the right to "impose new conditions on use of the Site, from time to time."  The Tennessean, *Terms of Service*, https://cm.tennessean.com/terms#otnotice-section-0b430bf4-1664-46e0-8572-5d9df5d77663 (last visited Jan. 14, 2023).[4]

The Privacy Policy also discloses precisely the activity Plaintiffs complain about, explaining (a) Gannett collects information about "[y]our behavior, movement and activity on or within the Product" (defined to encompass *The Tennessean* website), and (b) Gannett uses "cookies" and "tracking pixels" including to "provide users with interest-based content and/or advertising."  In addition, the Privacy Policy offers resources for opting out of "tracking and receiving tailored advertisements" via advertising self-regulatory programs.  The Tennessean, *Privacy*

---

[3] The Court may consider the Privacy Policy in effect prior to July 25, 2022 attached to Gannett's Motion to Dismiss because it is "undisputedly authentic" and Plaintiffs' "claims are based upon these document."  *Hughes v. United Parcel Serv., Inc.*, 639 F. App'x 99, 103 (3d Cir. 2016).

[4] The Complaint confusingly alleges that Plaintiff Greta Edwards signed up for the Newsletter "in or around 2016 or 2017, 2022," Compl. ¶ 14, but to the extent she is asserting she signed up in 2016 or 2017, her suit would be barred by a provision in the Terms of Service requiring claims "arising out of or related to use of the Site" to be filed "within one year after such claim or cause of action arose."  The Tennessean, *Terms of Service*, https://cm.tennessean.com/terms#otnotice-section-0b430bf4-1664-46e0-8572-5d9df5d77663.

*Policy*, https://cm.tennessean.com/privacy#otnotice-section-9a87c479-830e-4fd7-889d-4402100fad01.[5]

The Cookie Policy contains similar disclosures, explaining that Gannett uses cookies to "allow us to track web usage behavior." It offers similar resources for individuals to opt out of targeted advertising, and also specifically identifies "www.facebook.com" as the source of third party cookies used for re-targeting. The Policy explains that while first party cookies are placed "directly by the owner of the site, in this case, Gannett," third party cookies are placed "by third party providers" such as Facebook. The Tennessean, *Cookie Policy* (Oct. 5, 2020), https://cm.tennessean.com/cookie-policy#.

## LEGAL STANDARD FOR MOTION TO DISMISS

Rule 12(b)(6) requires dismissal of a complaint that lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Neither reciting the elements of a violation nor "'naked assertion[s]' devoid of 'further factual enhancement'" suffice. *Id.* A complaint must also be dismissed under Rule 12(b)(1) if a plaintiff lacks standing. *E.g.*, *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). To establish standing, a plaintiff must show "(i) that he suffered an injury

---

[5] The Privacy Policy contained substantially similar terms prior to the July 25, 2022 update. *See* Exhibit B to Gannett's Motion to Dismiss.

in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).   In assessing standing, federal courts consider whether a plaintiff's "asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts," *id*. at 2200, and whether the plaintiff alleges "a bare procedural violation, divorced from any concrete harm." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341-42 (2016).

## ARGUMENT

### I.   Plaintiffs Consented to a Class Waiver, Barring Their Putative Class Claims.

Plaintiffs, who both allege that they signed up for the Newsletter in 2022 (Compl. ¶¶ 13, 14), agreed to the Privacy Policy by clicking a button confirming their assent.[6]   Where a consumer clicks a button to indicate assent to terms, the agreement is enforceable like any other contract.   *Micro Focus (US), Inc. v. Ins. Servs. Off., Inc.*, No. CV 15-252-RGA, 2021 WL 4061141, at *6 (D. Del. Sept. 7, 2021) (finding sufficient evidence for a jury to infer an agreement where individuals had to "click to agree to the terms of the applicable agreements").

---

[6] Plaintiffs also agreed to the Terms of Service and the Cookie Policy in the same manner. This is shown in Plaintiffs' Complaint and can also be seen on *The Tennessean*'s website.   Compl. ¶ 113; The Tennessean, *Newsletter Sign-Up*, https://profile.tennessean.com/newsletters/manage/.

The Privacy Policy permits Plaintiffs to bring claims "only in an individual capacity, and not as a plaintiff or class member in . . . a federal or state class action lawsuit."  The Tennessean, *Privacy Policy*, https://cm.tennessean.com/privacy#otnotice-section-9a87c479-830e-4fd7-889d-4402100fad01.  While prior to July 25, 2022, the Privacy Policy did not contain a class waiver, it did contain a provision allowing Gannett to "amend this Privacy Policy at our discretion and at any time."  *See* Exhibit B to Gannett's Motion to Dismiss at 10.  Such a provision is enforceable with prior consent.  *E. States Constr. Serv., Inc. v. City of Dover*, No. 12C-05-041 JTV, 2014 WL 807916, at *3 (Del. Super. Feb. 26, 2014) (recognizing validity of term allowing defendant to "unilaterally, at any time, . . . make any change in the work within the general scope of the contract"); *see also Miracle-Pond v. Shutterfly, Inc.,* No. 19 CV 04722, 2020 WL 2513099, at *4-5 (N.D. Ill. May 15, 2020) (enforcing unilateral modification term where, as here, visitors agreed by clicking a button).

Federal Rule of Civil Procedure 23 does not "establish an entitlement to class proceedings," *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013), and courts routinely dismiss class claims based on a class waiver.  *See, e.g.*, *Horowitz v. AT&T Inc.*, No. 3:17-CV-4827-BRM-LHG, 2018 WL 1942525, at *20 (D.N.J. Apr. 25, 2018), *opinion clarified on denial of reconsideration*, 2019 WL 77306 (D.N.J. Jan. 2, 2019); *Korea Wk., Inc. v. Got Cap., LLC*, No. CV 15-6351, 2016 WL

3049490, at *11 (E.D. Pa. May 27, 2016).  The Privacy Policy's class waiver should therefore be enforced according to its terms and Plaintiffs' class claims should be dismissed.

## II.    Plaintiffs Fail to State Individual Claims Under the VPPA.

### A.    Gannett Is Not A Video Tape Service Provider.

To bring a VPPA claim, individuals must purchase, rent, or subscribe to goods or services from a "video tape service provider," defined, in relevant part, as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. §§ 2710(a)(1), (a)(4). This Circuit has not determined whether an online news provider like Gannett falls within the statute's ambit, but applying the VPPA here would stretch the statute far beyond its intended bounds.  *See Nickelodeon*, 827 F.3d at 284 ("Congress's purpose in passing the [VPPA] was quite narrow . . . [w]e do not think that [it] intended for the law to cover factual circumstances far removed from those that motivated its passage."); 134 Cong. Rec. S5397-01 (daily ed. May 10, 1988) (statement of Sen. Paul Simon) (explaining the VPPA ensures "that individuals will maintain control over their personal information when renting or purchasing *a movie* . . . .").

Gannett delivers news and journalism primarily via written articles and still photos, and therefore cannot be considered a video tape service provider.  Indeed, the federal government has argued "the VPPA does not impose liability on any entity

other than a 'video tape service provider' for revealing [PII]—including *any news organization*."   United States of America's Memorandum in Support of the Constitutionality of the Video Privacy Protection Act at 18, *Stark et al. v. Patreon, Inc.*, No. 3:22-cv-03131-JCS (N.D. Cal. Dec. 5, 2022), D.I. 49-1 (emphasis added).[7] *See also In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (if conveyance of video content is not "a focus of the defendant's work" and defendant's product is not "significantly tailored" to delivery of video content, defendant is not a video tape service provider).

Moreover, because the VPPA is codified as a criminal statute with civil penalties, it must be construed strictly to prevent it from being applied in situations not clearly contemplated by the legislature.[8]  *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (if a statute has criminal and non-criminal applications, the rule of lenity must be applied consistently to both).  Here, Gannett's news offerings are a far cry from the video rental store that disclosed Judge Bork's rental history, making application of the VPPA inappropriate.

## B.   The Newsletter Falls Outside the VPPA's Ambit.

Plaintiffs also have not alleged that they subscribed to an offering that comes within the VPPA's ambit.  Their theory appears to be that by signing up for the

---

[7] The Court may consider "matters of public record" in evaluating Gannett's motion. *Hughes*, 639 F. App'x at 103.

[8] Title 18 of the U.S. Code deals with "Crimes and Criminal Procedure."

Newsletter (Compl. ¶¶ 13, 14), which is marketing content delivered via email entirely separate from video content available on *The Tennessean*'s website, they are "subscribers" within the meaning of the VPPA. *See* Exhibit A to Gannett's Motion to Dismiss.

But because Plaintiffs' purported "subscription" bears no connection to the video content available on *The Tennessean* website, it does not fall within the VPPA's ambit. *See Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 671 (S.D.N.Y. 2015) (expressing skepticism that plaintiff could establish she was a subscriber under the VPPA where she signed up for a newsletter "distinct and set apart" from defendant's provision of videos); *United States v. Shultz*, No. 16-10107-01-EFM, 2018 WL 534333, at *3 (D. Kan. Jan. 24, 2018) (emphasis in original) (rejecting argument that the VPPA could be violated "by identifying a person as having requested or obtained *any* service from a video tape service provider.").

Furthermore, the Newsletter is not a "good[]" or "service[]" within the meaning of the VPPA. Although neither goods nor services are defined in the statute, its legislative history, or cases applying the VPPA, the Newsletter should be considered neither because it is not tangible chattel or labor. *Chesapeake Utilities Corp. v. Am. Home Assur. Co.*, 704 F. Supp. 551, 563 (D. Del. 1989) (relying on dictionaries defining goods as "tangible items" and "tangible movable personal

property"); *Service*, Black's Law Dictionary (11th ed. 2019) (defining service as "[l]abor performed in the interest or under the direction of others; specif., the performance of some useful act or series of acts for the benefit of another, usu[ally] for a fee."). The free Newsletter—a marketing tool designed to increase engagement with *The Tennessean*—cannot be considered a good or a service under the VPPA. It is certainly not corporeal like a video tape and does not constitute the provision of labor to the end user. For this additional reason, Plaintiffs' VPPA claims fail.[9]

### C.   Plaintiffs Have Not Plausibly Alleged Gannett Disclosed PII.

While the Complaint alleges Gannett discloses Plaintiffs' video viewing history to Facebook via the Pixel (*see* Compl. ¶ 30), that is insufficient to establish disclosure of PII because the VPPA defines PII as information "which identifies a person" as having requested or obtained specific video materials. 18 U.S.C. § 2710(a)(3). As the Third Circuit has recognized, "[t]he classic example [of PII under the VPPA] will always be a video clerk leaking *an individual customer's* video rental history. Every step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." *Nickelodeon*, 827 F.3d at 284, 290 (emphasis

---

[9] The better understanding of the Newsletter is that it is an "advertisement" which falls outside the ambit of the VPPA. In the context of the Telephone Consumer Protection Act, for example, an "advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1). *See also Advertisement*, Black's Law Dictionary (11th ed. 2019) ("A commercial solicitation; an item of published or transmitted matter made with the intention of attracting clients or customers.").

added).  Attempting to fill this gap, Plaintiffs allege that identifying information was disclosed to Facebook via the c_user cookie.  Compl. ¶ 32.  The c_user cookie, however, is Facebook's, so to the extent it was disclosed, that disclosure occurred from Facebook to itself.  Facebook, *Cookies Policy*, https://www.facebook.com/privacy/policies/cookies/ (click "Authentication"). Accordingly, it cannot be Gannett who disclosed this cookie.

In addition, Plaintiffs do not and cannot allege that an ordinary person could use the cookie itself to "identify a specific individual's video-watching behavior" as required to plausibly allege PII was disclosed.  *Nickelodeon*, 827 F.3d at 284, 290. As the Third Circuit has acknowledged, "[t]o an average person . . . a digital code in a cookie file would likely be of little help in trying to identify an actual person." *Id.* at 283.  And while the Third Circuit has not specifically addressed the issue, the better view is that whether Facebook can itself read the c_user cookie does not bear on whether Gannett disclosed PII, because the abilities of a recipient do not dictate what constitutes PII.  *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (PII "must have the same meaning without regard to its recipient's capabilities"); *Wilson v. Triller*, 598 F. Supp. 3d 82, 92 (S.D.N.Y. 2022) (citation omitted) (explaining the "definition of PII . . . does not make the scope of PII dependent on the specifics of the recipient of the disclosure.").  Plaintiffs have thus failed to plausibly allege that Gannett disclosed PII here.

14

**D.     Plaintiffs Have Not Plausibly Alleged Gannett "Knowingly" Disclosed PII**.

The only allegations in the Complaint explicitly addressing the VPPA's "knowingly" requirement conclusorily assert that Gannett knew it was disclosing PII.  Compl. ¶¶ 10, 28, 130.  Indeed, Plaintiffs' Complaint assumes it is enough to explain the functionality of the Facebook Pixel to support its claim that Gannett knowingly disclosed PII, ignoring the weight of authority finding a simple allegation that a defendant transmitted information sufficient to reconstruct PII cannot sustain a VPPA claim.  *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 181, 183 (S.D.N.Y. 2015) (if a third party has to "reverse engineer" PII, there can be no knowing disclosure); *see In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1099 (N.D. Cal. 2015) (no viable VPPA claim where Hulu "did not know" c_user cookies would be combined with video titles).

Gannett is responsible for grasping the "nature of the information actually disclosed," not "the informational capabilities of any third-party recipient" like Facebook.  *See Robinson*, 152 F. Supp. 3d at 181-82.  If, as here, a defendant "did not think it was conveying PII, then there could be no knowledge of the conveyance."  *Bernardino v. Barnes & Noble Booksellers, Inc*., Case No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017), *adopted by*, 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017).

Moreover, because the c_user cookie is disclosed from Facebook to itself, Gannett cannot be knowingly disclosing PII. It is "the information actually 'disclose[d]' by a 'video tape service provider,' which must itself do the identifying that is relevant for purposes of the VPPA . . . not information disclosed by a provider, plus other pieces of information collected elsewhere by non-defendant third parties," as here. *Robinson*, 152 F. Supp. 3d at 182 (citation omitted). But Facebook, not Gannett, collected the allegedly identifying information and Plaintiffs do not allege that this information was ever shared with Gannett. Gannett thus cannot have knowingly disclosed PII.

### E.    Gannett Met the VPPA's Requirements in Obtaining Plaintiffs' Consent to the Alleged Disclosures.

Plaintiffs' claim also fails for the separate and independent reason that the VPPA permits disclosures of PII where, as here, defendants meet three requirements in obtaining individuals' consent to disclosure. Plaintiff's allegations to the contrary (Compl. ¶¶ 110-14) are incorrect as a matter of law.

First, the Privacy Policy and Cookie Policy are "distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i). While *The Tennessean* also has Terms of Service related to readers' other legal obligations (The Tennessean, *Terms of Service*, https://cm.tennessean.com/terms#otnotice-section-0b430bf4-1664-46e0-8572-5d9df5d77663), the Policies focus on sharing of personal information and address

the exact type of disclosure Plaintiffs take issue with, explaining: (a) Gannett collects information about how visitors use *The Tennessean* website, (b) Gannett uses "cookies" and "tracking pixels" including for targeted advertising, and (c) "www.facebook.com" sets third party cookies on the website. *See* The Tennessean, *Privacy Policy*, https://cm.tennessean.com/privacy#otnotice-section-9a87c479-830e-4fd7-889d-4402100fad01; The Tennessean, *Cookie Policy*, https://cm.tennessean.com/cookie-policy#.

Second, consent is "given at the time the disclosure is sought." 18 U.S.C. § 2710(b)(2)(B)(ii). Plaintiffs agreed to the Policies when creating their accounts, consenting in advance to the alleged disclosures. Compl. ¶ 113. Moreover, the Privacy Policy has been posted on the website at all relevant times. *See* Exhibit B to Gannett's Motion to Dismiss. Because visitors encountered the Privacy Policy whenever they landed on the website, consent was thereby "given at the time disclosure [was] sought."

Third, Gannett clearly and conspicuously provides individuals the ability to opt out of information sharing with third parties. 18 U.S.C. § 2710(b)(2)(B)(iii). The Privacy Policy offers resources for individuals to opt out of "tracking and receiving tailored advertisements," as does the Cookie Policy. The Tennessean, *Privacy Policy*, https://cm.tennessean.com/privacy#otnotice-section-9a87c479-

830e-4fd7-889d-4402100fad01;     The     Tennessean,     *Cookie     Policy*,

https://cm.tennessean.com/cookie-policy#.

## III.   Plaintiffs Lack Article III Standing.

### A.     Plaintiff Has Not Suffered an Injury in Fact.

The Supreme Court in recent years has taken steps to limit "no injury" class actions like this one.  Where, as here, a plaintiff alleges only an intangible harm, such harm is sufficiently concrete to confer standing only if it "has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit[.]" *TransUnion*, 141 S. Ct. at 2200, 2204; Compl. ¶ 45.  While federal courts have recognized certain privacy torts such as public disclosure of private facts and intrusion upon seclusion, neither bears a "close relationship" to the harm alleged here:  Plaintiffs do not allege any actual person, let alone the public, ever saw or accessed the information allegedly disclosed.  *Atramian v. Gorkin*, No. 97C-08-001, 1999 WL 743663, at *3 (Del. Super. Aug. 13, 1999) (disclosure of personal information did not constitute public disclosure of private facts where there was "no reason . . . to believe that the communications at issue here will reach the public"), *aff'd*, 746 A.2d 275 (Del. 2000) (unpublished table decision, text available at 2000 WL 139979); *Nickelodeon*, 827 F.3d at 294-95 (dismissing intrusion upon seclusion claim based on Google's "use of cookies" for tracking purposes).

While the Third Circuit in *Nickelodeon* found that alleged disclosure of PII to a third party in violation of the VPPA established Article III standing (827 F.3d at 274), the reasoning underlying its decision was subsequently called into question by *TransUnion*. *TransUnion* stated that "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." 141 S. Ct. at 2205. Yet the Third Circuit in *Nickelodeon* only explicitly assessed whether *Congress* had historically provided plaintiffs "with the right to seek redress for unauthorized disclosures of information," not whether these alleged disclosures bore a close relationship to harms traditionally recognized at common law, as *TransUnion* now requires. 827 F.3d at 274. And where, as here, "an essential element" of a common law analogue is missing, plaintiffs fail to establish Article III standing. *See Rabinowitz v. Alltran Fin. LP*, No. 21-12756, 2022 WL 16362460, at *8 (D.N.J. Oct. 25, 2022).

Moreover, Gannett's disclosures address the exact type of disclosure Plaintiffs take issue with. The Tennessean, *Privacy Policy*, https://cm.tennessean.com/privacy#otnotice-section-9a87c479-830e-4fd7-889d-4402100fad01. Plaintiffs' allegations therefore boil down to an argument that Gannett's disclosures do not meet the requirements of a "distinct and separate" consent set forth in 18 U.S.C. § 2710(b)(2). While Gannett has met these

requirements as explained above, any failure to meet the requirements would be at most a "bare procedural violation" failing to satisfy Article III's "concrete injury" requirement.  *Spokeo*, 578 U.S. at 341-42 (noting a bare procedural violation of the FCRA may result in no harm).  The Court should thus find Plaintiffs failed to allege a concrete injury.

### B.    Plaintiff's Injury Is Not Fairly Traceable to Gannett's Conduct.

To establish the constitutional irreducible requirement of Article III standing, Plaintiffs' injuries also must be "fairly traceable" to Gannett's conduct, not be "self-inflicted," and not be the result of "the independent action of some third party not before the court."  *Campeau v. SSA*, 575 F. App'x 35, 38 (3d Cir. 2014); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  But here, to the extent the c_user cookie was deposited on Plaintiffs' browsers and transmitted, it was the result of their actions:  They must have (1) logged into Facebook, (2) accessed another website on the same browser, and (3) remained logged into Facebook.  *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 2758598, at *5 (N.D. Cal. June 17, 2014) ("When the 'remember me' box is checked, Facebook sets the c_user cookie"); *Austin-Spearman*, 98 F. Supp. 3d at 664 ("[I]f a person has chosen to remain logged into Facebook . . . this 'c_user' cookie will continue to operate. . . ."). Indeed, Plaintiffs could prevent transmission of the cookie by "logging out of Facebook." *Hulu*, 2014 WL 2758598, at *8, n.5.

Furthermore, Gannett's disclosures explain it uses "cookies" and similar technologies for advertising and explains users can use their browser settings to "disabl[e] or block[] any or all Cookies."   The Tennessean, *Privacy Policy*, https://cm.tennessean.com/privacy#otnotice-section-9a87c479-830e-4fd7-889d-4402100fad01; The Tennessean, *Cookie Policy*, https://cm.tennessean.com/cookie-policy#.  Facebook's disclosures similarly notify users that it uses cookies, including the c_user cookie, and that users can adjust their browser settings to "choose whether browser cookies are set and to delete them."   Facebook, *Cookies Policy*, https://www.facebook.com/privacy/policies/cookies   (click   "Browser   cookie controls").  Plaintiffs here could have adjusted these settings to prevent placement of the c_user cookie.

Any disclosure of Plaintiffs' information to Facebook therefore occurred due to their own actions and the operation of Facebook's cookie, and so is not fairly traceable to Gannett's conduct.  *Campeau*, 575 F. App'x at 38 (citation omitted) (plaintiff's "purely voluntary decision to travel to Baltimore" to seek to amend his social security records was a "self-inflicted injur[y] . . . not fairly traceable to the Government's purported activities"); *Tomasi v. Township of Long Beach*, 796 F. App'x 766, 769 (3d Cir. 2020) (plaintiffs' injury resulted from "independent decisions by two other entities" and so was not fairly traceable to defendant). Indeed, in *St. Louis Heart Center, Inc. v. Nomax, Inc.*, 899 F.3d 500, 502, 504 (8th

Cir. 2018), the court found the plaintiff's injury not traceable to the challenged conduct where the plaintiff, as here, "both invited and did not rebuke" the challenged conduct—the *St. Louis Heart Center* plaintiff conceded that it "requested samples" of a product and did not opt out of receiving faxes despite being provided with the opportunity to do so.

## CONCLUSION

For the foregoing reasons, Gannett respectfully requests that the Court dismiss the Complaint in its entirety.

OF COUNSEL:
David L. Yohai
Blake J. Steinberg
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
david.yohai@weil.com
blake.steinberg@weil.com

David R. Singh
Amy T. Le
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
david.singh@weil.com
amy.le@weil.com

Dated:  January 17, 2023

  */s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Counsel for Defendant Gannett Co., Inc.*

22