IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES BUECHLER and GRETA EDWARDS, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> GANNETT COMPANY, INC. <br><br> Defendant. | Civil Action No. 22-1464-CFC |

MEMORANDUM

Plaintiffs James Buechler and Greta Edwards alleged in their class action Complaint that Defendant Gannett Company, Inc.[1] violated the Video Privacy Protection Act ("VPPA" or "the Act"), 18 U.S.C. § 2710, *et seq*. In an Oral Order docketed on September 29, 2023, I granted in part and denied in part Gannett's motion to dismiss (D.I. 8) and dismissed the Complaint without prejudice to file an amended complaint. I explain here the reasons for my Oral Order.

---

[1] The Complaint named "Gannett Company, Inc." as the defendant. In its motion to dismiss, Gannett listed its name as "Gannett Co., Inc." *See also* D.I. 17 at 12 ("Defendant Gannett Co., Inc., incorrectly sued as Gannett Company, Inc."). I will refer to Defendant as "Gannett."

The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person . . . ." 18 U.S.C. § 2710(b)(1). The Act defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." § 2710(a)(1). The Act defines "personally identifiable information" as "includ[ing] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." § 2710(a)(3). Plaintiffs allege in their Complaint that they are subscribers to an electronic newsletter called *The Tennessean* that is distributed by Gannett and that provides subscribers access to articles and video content on Gannett websites. Plaintiffs claim that Gannett violated the VPPA by disclosing to Facebook the combination of Plaintiffs' personally identifiable information with the title, description, and subject matter of videos Plaintiffs watched on Gannett's websites. D.I. 1 ¶¶ 2, 8, 136–53.

Gannett moved to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Rule 12(b)(6). D.I. 8. The governing legal standards for Rules 12(b)(1) and 12(b)(6) are well known and undisputed, and I write primarily for the parties; so I will not repeat the standards here. I address the arguments Gannett

made in support of its motion in the order Gannett raised them in its Opening Brief.

### 1. Class Action Waiver

Gannett argued first that I should dismiss the Complaint because Plaintiffs consented to a class action waiver. According to Gannett, the waiver is set forth in a document titled "General Privacy Policy." Gannett stated in its brief that Plaintiffs "agreed to the [General] Privacy Policy by clicking a button [on a Gannett website] confirming their assent." D.I. 9 at 8. Gannett attached a copy of the Policy to its Opening Brief, but it did not bother to authenticate the document. The Policy is not mentioned in the Complaint and therefore cannot be said to be integral to Plaintiffs' claims. Accordingly, I will not consider it. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). More to the point, Gannett cited (and there is) nothing in the Complaint that suggests that Plaintiffs read or clicked a button to assent to the terms of the General Privacy Policy let alone to a class action waiver. I therefore rejected Gannett's first argument.

### 2. Video Tape Service Provider

Gannett next argued that Plaintiffs' VPPA claim fails as a matter of law because Gannett is not a "video tape service provider" as defined by the Act. The Complaint, however, alleges that Gannett hosts websites that "provide users with

3

access to online articles and video content," that Gannett "offers the option for users to subscribe to newsletters, . . . which provide access to articles and video content," and that Gannett "is a 'video tape service provider[ ]' because it creates, hosts, and delivers hundreds of videos on its websites . . . ." D.I. 1 ¶¶ 2, 3, 143. And the Act defines "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes *or similar audio visual materials* . . . ." § 2710(a)(4) (emphasis added). A prerecorded video on a website is an audio-visual medium that a jury could reasonably find to be similar to a prerecorded video cassette tape. The Complaint alleges that Gannett delivers such videos to its subscribers via the internet. The Complaint therefore plausibly implies that Gannett is a video tape service provider as defined by the Act.

Gannett argued that it "delivers news and journalism primarily via written articles and still photos," and that "applying the VPPA here would stretch the statute far beyond its intended bounds." D.I. 9 at 10. Such policy arguments, however, "cannot supersede the clear statutory text." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192 (2016). "If the meaning of the text is clear, 'there is no need to . . . consult the purpose of [the statute] at all.'" *United States v. E.I. Dupont De Nemours & Co. Inc.*, 432 F.3d 161, 169 (3d Cir. 2005) (quoting

4

*Cooper Indus., Inc. v. Aviall Services, Inc.,* 543 U.S. 157 (2004)) (first alteration in original). Accordingly, I rejected Gannett's second argument.

### 3. Plaintiffs' Subscriptions to *The Tennessean*

Gannett next argued that "because Plaintiffs' purported 'subscription' bears no connection to the video content available on *The Tennessean* website, it does not fall within the VPPA's ambit." D.I. 9 at 12. That's the entirety of its argument, and the two cases (from district courts outside the Third Circuit) Gannett cited immediately after this assertion do not support it. Accordingly, I rejected Gannett's third argument.

### 4. Gannett's Newsletter

Gannett next argued that *The Tennessean* newsletter "is not a 'good[]' or 'service[]' within the meaning of the VPPA" because "[i]t is certainly not corporeal like a video tape and does not constitute the provision of labor to the end user." D.I. 9 at 12–13 (alterations in the original). The VPPA does not define "goods or services." Accordingly, the terms are to be "construe[d] . . . in accordance with [their] ordinary or natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994). A "good" is "something that has economic utility or satisfies an economic want." https://www.merriam-webster.com/dictionary/good. "Services" are "useful labor that does not produce a tangible commodity." https://www.merriam-webster.com/dictionary/service. Neither term requires

5

"corporeality." The Complaint alleges that *The Tennessean* newsletter "provide[d] access to articles and video content." D.I. 1 ¶ 3. It thus plausibly implies that *The Tennessean* newsletter is a good or service within the scope of the VPPA. Accordingly, I rejected Gannett's fourth argument.

### 5. Whether Gannett Shared Personally Identifiable Information

Gannett next argued that the Complaint does not plausibly allege that Gannett knowingly disclosed Plaintiffs' personally identifiable information. As noted above, the Act defines "personally identifiable information" as "*includ[ing]* information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." § 2710(a)(3) (emphasis added). Because the Act's definition is a non-exhaustive list, "what counts as personally identifiable information under the Act is not entirely clear." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 281 (3d Cir. 2016). Although the Third Circuit analyzed the statutory definition at length in *Nickelodeon*, it ultimately decided not to offer "a single-sentence holding capable of mechanistically deciding [how the term should be applied in] future cases, and instead "tried to articulate a more general framework" for applying the term in the future. *Id.* Under that framework, "personally identifiable information under the Video Privacy Protection Act means the kind of information that would readily

6

permit an ordinary person to identify a specific individual's video-watching behavior." *Id.*

The parties' briefing on this issue was confusing, in large part because the Complaint does not clearly allege what Plaintiffs' personally identifiable information was disclosed from Gannett's websites, how it was disclosed, or who caused the disclosures.

The Complaint never defines what Plaintiffs' "personally identifiable information" is; but it does define implicitly what it is *not*. Specifically, in paragraph 7, the Complaint alleges that the VPPA "prohibit[s] video tape service providers, such as Defendant, from sharing personally identifiable information ('PII') tied to the title, description, or subject matter of prerecorded audio video material (the 'Video Watching Data') without valid consent." D.I. 1 ¶ 7. Thus, ironically, the Complaint *distinguishes* "personally identifiable information" *from* "Video Watching Data," notwithstanding the fact that the VPPA itself defines personally identifiable information as *including* the information defined by the Complaint as "Video Watching Data."

In paragraph 147 of the Complaint, Plaintiffs allege:

> Defendant disclosed to Facebook Plaintiffs' and the Class members' personally identifiable information. Defendant utilized the Tracking Methods to force Plaintiffs' web browser to transfer Plaintiffs' identifying information, *like their Facebook ID*[s], along with Plaintiffs' event data, like the title of the videos they viewed.

7

D.I. 1 ¶ 147 (emphasis added). The paragraph, like much of the Complaint, is ambiguous. It is not clear, for example, if the second sentence stands independent of the first sentence or was intended to elaborate on the first sentence. If it is the former, it is not clear to whom the "identifying information" in the second sentence is "transfer[red]." It is also not clear whether the phrase "like their Facebook ID[s]" means "similar to their Facebook ID[s]," "such as their Facebook ID[s]," or "including their Facebook ID[s]." Plaintiffs were similarly ambiguous in their briefing, but they at least confirmed in their Answering Brief that they had intended to allege in the Complaint that Gannett shared with Facebook PII that included Plaintiffs' Facebook IDs. *See* D.I. 15 at 9 ("The PII shared by Gannett with Facebook—in particular, Plaintiffs' Facebook IDs—satisfies both tests [articulated by courts for determining the scope of 'personally identifiable information'].").

Putting aside the Complaint's inadequacies with respect to personally identifiable information, the Complaint's factual allegations also do not explain with sufficient clarity how the PII is disclosed to Facebook and who causes it to be disclosed. In paragraph 4 of the Complaint, Plaintiffs allege that their "personal identifying information are [sic] captured by tracking methods utilized by Defendant (referred to as the 'Tracking Methods,' discussed and defined herein), and then transferred to Facebook." D.I. 1 ¶ 4. And in paragraph 8, they allege that

8

"Defendant has implemented and utilized the Tracking Methods[,] which track use activity on the Gannett [websites] and disclose that information to Facebook." D.I. 1 ¶ 8. Paragraphs 29 through 54 appear under the heading "Gannett Utilizes *Facebook* Tracking Methods to Gather and Transmit PII and Video Watching Data." D.I. 1 at 7 (emphasis added). And paragraph 29 alleges that "Facebook provides tools for web developers to utilize to monitor user interactions on their websites, which can then be shared with Facebook (*e.g., the Tracking Methods*)." D.I. 1 ¶ 29 (emphasis added). As best I can tell, the Tracking Methods of paragraphs 4 and 8 consist solely of the Facebook Tracking Methods described in paragraphs 29 through 54, but I cannot be sure of that.

The Complaint alleges that "[a]s a result of *Gannett's* implementation of the Tracking Methods, the PII and Video Watching Data for subscriber-users, including Plaintiffs and Class Members, have automatically been shared with Facebook in a consistent manner across all Gannett Sites." D.I. 1 ¶ 54 (emphasis added). But to the extent I can understand the Complaint's specific factual allegations, they appear to establish that the subscriber-users themselves and/or Facebook—not Gannett—implement the "Tracking Methods" (i.e., the "Facebook Tracking Methods") that result in the disclosure of Plaintiffs' PII and Video Watching Data to Facebook. For example, the Complaint alleges that "*[w]hen a Facebook user logs into Facebook,* a 'c_user' cookie—which contains a user's

9

non-encrypted Facebook User ID number ('UID')—is automatically created and stored on the user's device for up to a year." D.I. 1 ¶ 32 (emphasis added).  And it alleges that "[w]here c_user cookie *is active on a user's device*, the website's Tracking Methods will forward the user's UID to Facebook through a 'request.'" D.I. 1 ¶ 38 (emphasis added).  In the same vein, the Complaint alleges that "[e]xamples of Tracking Methods include event monitoring tools provided by Facebook Pixel," D.I. ¶ 30, and that the Pixel "tracks user-activity on web pages by monitoring events which, when triggered, causes the Pixel to automatically send data directly to Facebook through 'requests,'" D.I. 1 ¶ 34.  And paragraph 35 states that "[t]ere examples of events utilized by websites, including the Gannett Sites, include *a user loading* a page with (i) 'microdata' tags (the 'Microdata event'), or (ii) with a Pixel installed (the 'PageView event'), or (iii) loading a specific page being tracked by a Pixel (the 'ViewContent event')." D.I. 1 ¶ 35 (emphasis added).

The bottom line is that the Complaint is too poorly drafted for me to evaluate the competing arguments of the parties on this issue.  The sloppiness of the Complaint is apparent on its face, and there is good reason to believe that the Complaint is a copy-and-paste job.  Paragraph 25 of the Complaint, for example, quotes statements from what the Complaint says is a "*recent* Senate Judiciary Committee meeting."  D.I. 1 ¶ 25 (emphasis added).  The hearing in question

10

occurred more than a decade ago. D.I. 1 at 6 n.5. The Complaint explicitly relies on and directs the reader's attention to the content of 110 computer screenshot images in the body of the Complaint and the Complaint's exhibits. But the text of the screenshots is fully legible in only 19 of the 110 images. The 34-page Complaint is replete with words, footnotes (40!), and links to websites (29 URLs), but it lacks clarity and does not consistently use purportedly defined terms (e.g., Tracking Methods). In sum, the Complaint contains anything but "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

All plaintiff counsel, but especially counsel who seek to represent a class of plaintiffs, need to spend the necessary time and effort to draft a complaint that complies with Rule 8's "plain statement" mandate. That was not done here. Accordingly, I granted Gannett's motion in part and dismissed the Complaint.[2]

### 6. Plaintiffs' Consent to Disclosures under the VPPA

Gannett argues that "Plaintiffs' claim also fails for the separate and independent reason that the VPPA permits disclosures of PII where, as here, defendants meet three requirements in obtaining individuals' consent to

---

[2] I note that the Complaint in this case is markedly different in quality from the complaint filed in another VPPA-based class action filed against Gannett in Massachusetts. *See Belozerov v. Gannett Company, Inc.*, 4:22-cv-10838-MRG, D.I. 1.

11

disclosure." D.I. 9 at 16. Gannett's argument hinges on the content and putative posting on its websites of its General Privacy Policy. *See* D.I. 9 at 16–17. As noted above, however, the General Privacy Policy Gannett attached to its Opening Brief is unauthenticated, and the Complaint does not plausibly imply that Plaintiffs consented to the terms of the Policy. Accordingly, I rejected Gannett's sixth argument.

### 7. Plaintiffs Lack Article III Standing

Gannett makes two standing arguments. First, it argues that Plaintiffs have failed to allege a concrete injury under *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). Plaintiffs, however, pleaded that they watched "prerecorded video content on the Tennessean website" and doing so "result[ed] in [their] [personally identifiable information] and Video Watching Data being shared with Facebook" in violation of the VPPA. D.I. 1 ¶¶ 13–14. I agree with the "[s]everal courts [that] have held these allegations to be sufficient to establish concrete injury (and standing) post-*TransUnion*." *Salazar v. Nat'l Basketball Ass'n*, 2023 WL 5016968, at *5 (S.D.N.Y. Aug. 7, 2023) (citing *Carter v. Scripps Networks, LLC*, 2023 WL 3061858, at *3 (S.D.N.Y. Apr. 24, 2023); *Martin v. Meredith Corp.*, 2023 WL 2118074, at *2 (S.D.N.Y. Feb. 17, 2023), *appeal withdrawn*, 2023 WL 4013900 (2d Cir. May 24, 2023); *Salazar v. Glob.*, 2023 WL 4611819, at *7 (M.D. Tenn. July 18, 2023)); *see also In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d

12

at 274 ("While perhaps 'intangible,' the harm is also concrete in the sense that it involves a clear *de facto* injury, *i.e.*, the unlawful disclosure of legally protected information. Insofar as *Spokeo* directs us to consider whether an alleged injury-in-fact has traditionally been regarded as providing a basis for a lawsuit, *Google* noted that Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private.") (citing *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 134 (3d Cir. 2015)) (internal quotation marks, footnotes, and citations omitted).

Second, Gannett argues that Plaintiffs lack Article III standing because, "to the extent [Plaintiffs] suffered any injury at all, it was caused by the operation of Facebook's cookies and their own conduct (e.g., consenting to Facebook's placement of the cookies), and so is not fairly traceable to Gannett's conduct." D.I. 9 at 2. Gannett is correct as a legal matter that to establish standing, the plaintiff must show a "causal connection between the injury and the conduct complained of." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). In other words, the plaintiff must establish that the alleged injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (alterations removed and citation omitted). Here, as just discussed, it is not clear from the Complaint whether

13

Plaintiffs have alleged facts that plausibly imply that Gannett knowingly engaged in conduct that resulted in the disclosure of Plaintiffs' personally identifiable information. Since Plaintiffs bear the burden to persuade the Court that it has subject matter jurisdiction, *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991), the Complaint's failure in this regard warrants dismissal under Rule 12(b)(1).

\* \* \* \*

For these reasons I granted in part and denied part Gannett's motion and dismissed the Complaint without prejudice. If Plaintiffs seek to file an amended complaint, they must do so no later than November 17, 2023.

                                                               _____
                                                                                    CHIEF JUDGE